NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0524n.06

No. 24-1911

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 06, 2025
KELLY L. STEPHENS, Clerk

)
)
UNITED STATES OF AMERICA,          )
)
Plaintiff-Appellee,          )          ON APPEAL FROM THE
)          UNITED STATES DISTRICT
v.          )          COURT FOR THE WESTERN
)          DISTRICT OF MICHIGAN
)
ARISKNIGHT ARKIN-EVERETT WINFREE,          )
)          OPINION
Defendant-Appellant.          )
)

---

BEFORE: GRIFFIN, THAPAR, and MATHIS, Circuit Judges.

GRIFFIN, Circuit Judge.

After pleading no contest to kidnapping, coercion and enticement, attempted coercion and enticement, and two counts of sexual exploitation of a minor, defendant Arisknight Arkin-Everett Winfree was sentenced to life in prison. On appeal, he argues that his life sentence is unreasonable and violative of the Eighth Amendment because recidivism rates for similar sex-crime offenders decrease as they age. He also contends that his trial counsel was ineffective for not raising these arguments to the district court. Finding no error, we affirm.

I.

A.

In summer 2022, Winfree posted an advertisement online for an au pair, purportedly for his seven-year-old niece. But Winfree did not have a niece. And rather than seeking actual childcare, Winfree and his friend, Paul Heiselman, planned to lure women between 16 and 23 years old for sex.

In July 2022, A.S., an 18-year-old woman, began communicating with Winfree about the au pair position. Winfree hired her, and she flew from Kansas to East Lansing, Michigan, for the job. Winfree picked her up from the airport and brought her to his house. Upon arriving, A.S. noticed that all the windows were covered and that there were cameras in multiple rooms. A.S. observed no sign of children. She did, however, see several knives and firearms scattered about the house, as well as handcuffs in Winfree's bedroom.

That night, Winfree asked A.S. to go into another bedroom and try on several swimsuits he had purchased for her. A.S. reluctantly went into the bedroom but did not try on any of the swimsuits because she saw cameras in the room. A.S. also discovered a camera in her bedroom, facing the bed, which she unplugged. That night, A.S. had to remove tape covering the bedroom door's latch to lock it.

The next day, A.S. did housework while Winfree was at work. When Winfree returned, he repeatedly asked A.S. to give him a massage, but she declined each time. Later that day, Winfree confronted A.S. about unplugging the camera and removing the tape from the door. A.S. spoke with her aunt and sister that evening about the situation. And the following day, based on a call from A.S.'s sister, the East Lansing Police Department conducted a welfare check. A.S. appeared distraught and left with the police.

B.

In September 2022, Winfree began communicating with S.D., a 19-year-old Italian woman, about the au pair position. S.D. spoke very little English, if any, and relied on a translator to communicate with Winfree. Winfree helped S.D. obtain a visa and a plane ticket to Michigan. On October 12, 2022, S.D. flew to Detroit and then took a bus to East Lansing. Winfree picked her

up from the bus stop and took her to his house. S.D., like A.S., noticed that the windows were covered and that cameras were placed around the house.

The next day, S.D. did housework while Winfree was out of the house. That evening, Winfree entered her room and told her to wear only a bathrobe. He then had her follow him to his room. Winfree began touching S.D.'s legs, but she rejected his advances. In response, Winfree put his arm around her neck and handcuffed her behind her back. He then placed a ball gag in her mouth, laid her on her stomach, and took pictures of her while touching her genitals. Winfree repeatedly forced her to verbally consent while he recorded on his cellphone. He continued to sexually assault and record her. Eventually, Winfree removed the now-bloodied ball gag from her mouth and forced her upstairs, injuring her shoulder in the process.

Once upstairs, Winfree tied her legs apart, repeatedly penetrated her with sex toys, and then forced her to engage in sexual intercourse. He left her handcuffed and tied up until the next morning.

Afterward, Winfree spoke with Heiselman. Winfree told Heiselman what he had done to S.D., and he shared images of the assault. But they dispute the remainder of the conversation. According to Heiselman, Winfree said that he would keep S.D. for a week, stating that "no one would know she is gone." Heiselman also recounts that Winfree discussed killing S.D. and hiding her body, but he ultimately convinced Winfree to let S.D. go. Winfree recalls the conversation differently. He claims that Heiselman—not Winfree—initially mentioned imprisoning S.D. at the house, and only later told Winfree to bring her to the airport.

Regardless, Winfree eventually dropped S.D. off at a bus station, but only after taking her money and removing the SIM card from her phone. Upon returning to Italy, S.D. alerted

authorities and underwent a sexual-assault examination. The examination revealed male DNA and bruising on S.D.'s vaginal wall.

C.

In fall 2022, Winfree began communicating with MV1, a 17-year-old high school student. Over a two-week period, Winfree requested images and videos of her masturbating. MV1 complied. Winfree sent the nude images and videos to Heiselman.

After communicating for some time, Winfree and MV1 agreed to meet up, and Winfree picked her up from school and brought her to his house. The two engaged in oral sex and sexual intercourse. MV1 later took an emergency contraceptive and went to a local hospital for a sexual-assault examination. Winfree continued attempting to contact MV1 using fake Instagram accounts, which led to MV1 alerting school officials for her safety.

Also in fall 2022, a friend of Winfree introduced him to MV2, another 17-year-old high school student. Winfree told MV2 that he was 18 years old, even though he was 30 years old. Winfree requested nude pictures and videos. MV2 sent Winfree nude pictures and videos of her masturbating, some of which Winfree sent to Heiselman. Eventually, Winfree arranged for MV2 to have sex with Heiselman. MV2 and Heiselman met and had sexual intercourse. Winfree and Heiselman discussed having MV2 "bring [them] other hs [high school] girls." Winfree's Instagram account revealed he contacted "hundreds if not thousands of women"—a majority of whom were students at Michigan State University.

D.

Based on this conduct, Winfree pleaded *nolo contendere* without a plea agreement to five charges: Kidnapping, in violation of 18 U.S.C. § 1201(a)(1) (Count 1); Coercion and Enticement, in violation of 18 U.S.C. § 2422(a) (Count 2); Attempted Coercion and Enticement, in violation

of 18 U.S.C. § 2422(a) (Count 3); and Sexual Exploitation of a Minor, in violation of 18 U.S.C. § 2251 (Counts 4 and 5).

Over the course of the criminal case, Winfree received several mental health evaluations. In these evaluations, Winfree recounted episodes where he was "hyper focused" and suffered from panic attacks and depression, while also experiencing "delusions of grandeur." During these episodes, Winfree often traveled and pursued business ideas, which were generally unsuccessful. Winfree currently takes medication for bipolar disorder, which he reports makes him feel better. However, the Bureau of Prisons ultimately ruled out a bipolar disorder diagnosis and instead diagnosed Winfree with narcissistic personality disorder. At sentencing, Winfree moved for a downward variance based on his mental health history.

After determining that Winfree had a criminal history category of I and a total offense level of 43, the district court denied Winfree's motion for a variance and imposed a within-Guidelines sentence of life in prison on Count 1, 240 months of imprisonment on each of Counts 2 and 3, and 360 months of imprisonment on each of Counts 4 and 5, to be all served concurrently. Winfree appeals his life sentence.

II.

We review a district court's sentence for both procedural and substantive reasonableness using the deferential abuse-of-discretion standard. *United States v. Evers*, 669 F.3d 645, 661 (6th Cir. 2012).

A.

When reviewing a sentence for procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the

§ 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Because the district court satisfied the procedural rule set forth in *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004)—asking the parties "whether they have any objections to the sentence just pronounced that have not previously been raised"—and Winfree did not object to his sentence, we apply plain error.

Winfree contends that "a life sentence is too excessive and not necessary for an offender like [] Winfree" because the risk of recidivism will significantly decrease as he ages into his 70s, 80s, or 90s. He asserts that common knowledge and journal research uniformly inform us that recidivism rates of sex crime offenders "drop significantly and steadily after age fifty." Winfree is in his early 30s. Thus, Winfree argues that the district court committed plain error by failing to consider recidivism rates for sex offenders when imposing a life sentence. We disagree.

Winfree never brought any recidivism information to the district court's attention at sentencing. And "we will not find that a district court committed plain error based on factual information the parties never provided." *United States v. Souders*, 747 F. App'x 269, 274 (6th Cir. 2018). Nor did Winfree alert the district court that it was erroneous for it not to address recidivism rates of sex offenders when sentencing him. And this is why the plain-error standard exists. It ensures that defendants bring any such error to the district court's attention at sentencing to provide the district court the "opportunity to correct its purported error" right then and there. *United States v. Simmons*, 587 F.3d 348, 358 (6th Cir. 2009). Finally, to the extent that Winfree is arguing that the district court erred in failing to consider recidivism rates as a mitigating factor at sentencing, "the district court's failure to consider [an] unargued factor is not an abuse of discretion." *See United States v. Roser*, 529 F. App'x 450, 454 (6th Cir. 2013) (citing *United States v. Walls*,

546 F.3d 728, 737 (6th Cir. 2008)). We therefore find no plain error regarding the procedural reasonableness of Winfree's life sentence.

B.

For the substantive reasonableness of Winfree's life sentence, that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. A district court abuses its discretion, however, if it "arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent factor." *United States v. Robinson*, 892 F.3d 209, 213 (6th Cir. 2018) (quoting *United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012)). We apply a rebuttable presumption that a within-Guidelines sentence is reasonable. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

Winfree contends the district court's imposition of a life sentence was excessive and greater than necessary to achieve the goals of 18 U.S.C. § 3553(a). He highlights that his mental illness contributed greatly to the commission of the offense and that he now receives medication and treatment. And the combination of improved mental health and a statistically low likelihood of recidivism suggests that a life sentence keeps Winfree in prison longer than is necessary to protect the public.

We again find no error in the district court's sentence. First, the district court began with the nature and circumstances of the offense, which it noted was "abhorrent":

> Specifically as it relates to . . . this case with SD, this individual, this young woman that came from Italy, the kidnapping and the coercion and enticement count, you created a fake story talking about how you had a family, lured her here for that purpose. And you not only sexually assaulted her, you handcuffed her. You placed a gag ball in her mouth. As you were sexually assaulting her, you placed a hand on her nose and her mouth. You raped her while she was handcuffed, and then you left her locked in a room overnight with her hands cuffed and her feet tied. No one should be treated that way.

> And then you did dispose of her. You threw her away. You tossed her out, took her money, took whatever she had, and left her basically to fend for herself after you had done these horrific acts to her.
>
> And you talked to your co-defendant, Mr. Heiselman, about how you wanted to kill her and hide her body.
>
> All that in and of itself just in terms of your acts against this one particular victim are at the serious end of the spectrum.

The district court recognized that the sentence it imposed must account for the seriousness of the offense including its lasting consequences on the victims, which "can't be understated." The district court also seriously questioned the genuineness of Winfree's remorse because he repeatedly attempted to shift the blame to Heiselman. And a final consideration by the district court was the need to "protect[] . . . the public from further crimes that [Winfree] may commit." These factors supported a within-Guidelines sentence of life in prison.

Winfree argues that the district court should have considered the need "to protect the public from further crimes of the defendant" with the recidivism rates of sex crime offenders in mind. *See* 18 U.S.C. § 3553(a)(2)(C). If the district court had done so, Winfree contends, it would have found that he would pose little risk to the public as an elderly man. But Winfree's attempt to relitigate § 3553(a)(2)(C)'s weight on his sentence is unavailing. The need to protect the public from further crimes is only one of several factors a district court must consider in fashioning a sentence.

Here, the district court adequately considered and weighed each relevant § 3553(a) factor and explained why a life sentence was appropriate. We "must give 'due deference' to the district court's conclusion that the sentence imposed is warranted by the § 3553(a) factors." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007) (quoting *Gall*, 552 U.S. at 51). The district court also considered Winfree's motion for a downward variance based on his mental health. Although it

found that the record supported his diagnosis for narcissistic personality disorder, it held that his mental health history was not a sufficient "basis or any justification for [it] to vary downward."

A life sentence is substantial, but the district court did not abuse its discretion in imposing it as a within-Guidelines sentence. We therefore conclude that Winfree's life sentence is not substantively unreasonable.

## III.

Next, Winfree asserts that his life sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment. We again apply plain error because Winfree failed to preserve his claim. *United States v. Young*, 847 F.3d 328, 363 (6th Cir. 2017); *Bostic*, 371 F.3d at 872.

A sentence violates the Eighth Amendment only in the limited case where there is an "extreme disparity" between the crime committed and the sentence imposed. *United States v. Moore*, 643 F.3d 451, 454 (6th Cir. 2011) (quoting *United States v. Layne*, 324 F.3d 464, 474 (6th Cir. 2003)). And we "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Solem v. Helm*, 463 U.S. 277, 290 (1983). Accordingly, "[a] sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *Moore*, 643 F.3d at 455 (quoting *Layne*, 324 F.3d at 474). And "an Eighth Amendment challenge *must* fail if a defendant receives a sentence within the [G]uideline range, when the [G]uideline range contemplates the gravity of the offense." *United States v. Abdulmutallab*, 739 F.3d 891, 907 (6th Cir. 2014) (emphasis added) (citing *United States v. Herrick*, 512 F. App'x 534, 538–39 (6th Cir. 2013)).

Winfree highlights that he committed the instant offenses "as a young man with severe mental illnesses that were untreated," and, as discussed above, that sex crime offenders exhibit a

lower risk of recidivism as they age. Because a life sentence will require Winfree to remain in prison through his final years, when he would no longer pose a threat to anyone, he argues that the life sentence is excessive and contrary to the "evolving standards of decency that mark the progress of a maturing society," and thus violates the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). We disagree.

Winfree committed abhorrent crimes and received a sentence within both the Guidelines and the statutory maximum. We have rejected similar Eighth Amendment challenges by defendants convicted of kidnapping—just one of Winfree's offenses—particularly where the "Sentencing Commission has concluded that a life sentence is reasonable for the crimes committed." *United States v. Angeles*, 484 F. App'x 27, 36 (6th Cir. 2012). Winfree does not dispute that the Guidelines recommended a life sentence given his criminal history category, total offense level, and the gravity of his conduct. Nor does he explain how the Guidelines recommendation of a life sentence for his crimes is extreme or grossly disproportionate. *Cf. United States v. Griffiths*, 846 F. App'x 384, 389 (6th Cir. 2021) (declining to "expand our . . . jurisprudence to accommodate [a] new proffered basis for obtaining sentence relief under the Eighth Amendment" where the defendant made "no attempt . . . to connect his theory to the Eighth Amendment's text, its history, or its existing jurisprudence"). Accordingly, Winfree's life sentence does not violate the Eighth Amendment. *See Abdulmutallab*, 739 F.3d at 907.

IV.

Finally, Winfree argues that his trial counsel was ineffective for failing to address recidivism rates among sex offenders and how they show that a life sentence is inappropriate. We often decline to consider "ineffective assistance of counsel claims on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the

allegations." *United States v. Ledbetter*, 929 F.3d 338, 364 (6th Cir. 2019) (quoting *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)). Such claims are usually "best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record." *United States v. Brown*, 332 F.3d 363, 369 (6th Cir. 2003). Winfree offers no reason to diverge from this practice, so we decline to hear his claim of ineffective assistance of counsel on this direct appeal.

V.

We affirm the judgment of the district court.